IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SOUTHWESTERN PHYSICAL THERAPY
AND REHABILITATION, INC.

            Plaintiff,

v.

ERIC ARMSTRONG,

            Defendant.



Civil No. 01-0260 MV/LCS

### DEFENDANT'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Southwestern Physical Therapy and Rehabilitation, Inc. ("SWPT"), committed material and substantial breaches of the contract that they had with Defendant, Eric Armstrong. Mr. Armstrong is, therefore, relieved from complying with any non-compete provisions of contract, and SWPT is not entitled to a temporary restraining order nor to a preliminary injunction.

### Statement of Facts

As set forth in Plaintiff's Motion, and in the affidavit of Eric Armstrong, which is filed separately herein, SWPT and Mr. Armstrong entered into a "Physical Therapy Agreement" on May 1, 1997. A copy of that agreement is attached as Exhibit A to the Complaint.

On March 16, 1998 the parties modified the Physical Therapy Agreement of May 1, 1997. The March 16, 1998 agreement is the contract that is in dispute in this case. A copy of the contract is attached as Exhibit B to the Complaint. The contract provides, in part, that "[i]n consideration of the THERAPIST's [i.e., Armstrong's] employment by SWPT hereunder, SWPT

shall pay THERAPIST a salary consisting of 35% of SWPT's gross accounts receivable from *all* Raton accounts." *Id.* (emphasis added).

Contrary to the express provisions of the contract, SWPT has not paid Mr. Armstrong based on the gross accounts receivable from *all* Raton accounts. Rather, despite the plain language of the contract, SWPT has regularly excluded both occupational therapy and speech therapy receivables when computing Mr. Armstrong's compensation. *See* Affidavit of Eric Armstrong, ¶5. In addition, with regard to the Sun Healthcare account, SWPT regularly deducted the amount of gross receipts tax from the accounts receivable from Sun Healthcare, resulting in a reduction in the amount upon which Mr. Armstrong's compensation was calculated. *Id.* Mr. Armstrong did not consent to these changes in his compensation under the contract. *See, e.g.*, Exhibit B to the Affidavit of Eric Armstrong, memo dated January 18, 1999 ("I am also questioning your memo from November about the gross receipts tax (GRT) from Sun Healthcare . . . . I do not think GRT should come out of gross accounts receivable.").

The contract further provides that Mr. Armstrong "is entitled to the following benefits:"

1. All professional association dues paid.
2. Full medical insurance for himself and his family.
3. Continuing education paid up to $1,000.00 (thousand) per year, and two work days leave.
4. 401-K plan.
5. Basic life and supplemental insurance plans.
6. Personal time off (PTO's) as outlined in SWPT's policies and procedures.
7. Professional Liability Insurance paid in full.

Exhibit B to the Complaint. *See also*, Exhibit A to the Affidavit of Brandon Baca.

Contrary to the express provisions of the contract, in a memo received by Mr. Armstrong in January 1999, SWPT announced that as of December 31, 1998, it had unilaterally decided to

2

terminate its 401-k plan.  *See* Exhibit A to Armstrong affidavit, and affidavit at ¶7; *see also* affidavit of Brandon Baca, filed separately herein, ¶5.  The same SWPT memo also informed Mr. Armstrong that SWPT anticipated making changes in its medical insurance coverage benefits.  Armstrong affidavit, ¶8; Baca affidavit, ¶6.

In response to SWPT's memo, Mr. Armstrong sent a memo to John Willmore, then secretary and treasurer of SWPT, telling him "I am concerned about the deletion of the 401K plan and your comment about the possibility of canceling the health plan.  These are both in my contract as benefits . . . . I would like the benefits and reimbursement issues resolved as soon as possible."  Exhibit B to Armstrong affidavit, memo from Eric Armstrong to John Willmore dated January 18, 1999.

In response to this memo, Mr. Willmore referred Mr. Armstrong to Ron Christensen, then president of SWPT. Armstrong affidavit, ¶10.  When Mr. Armstrong expressed his concerns to Mr. Christensen, he was told that SWPT was working on replacing the 401K plan with some other type of deferred compensation plan.  *Id.*  When it appeared that SWPT was not moving forward on the issue, Mr. Armstrong contacted John Martin, a local investment consultant, and asked him if he would be willing to discuss possible deferred compensation plans with his superiors at SWPT.  Mr. Martin contacted either Mr. Christensen or Mr. Willmore, or both, and set up two separate appointments to discuss such plans with them.  SWPT did not keep either appointment.  *Id.*, ¶¶ 11 and 12.

On June 1, 1999, SWPT terminated its employee health insurance coverage benefit and its term life insurance benefit.  *See* Exhibit B to affidavit of Brandon Baca.  Soon thereafter, Mr. Armstrong began receiving an additional $330 per month in his paycheck.  This payment was

3

listed as a "bonus." Armstrong affidavit, ¶14. Mr. Willmore told Mr. Armstrong that in no way should the bonus be construed as payment for health insurance, since such payments were not being provided to all SWPT employees. *See also*, Exhibit B to affidavit of Brandon Baca, and Baca affidavit ¶8 (Mr. Baca was to receive a bonus of $80 per month "to *help* defray the cost of your personal policy") (emphasis added).

Unfortunately, the "bonus" payment, after taxes, was not sufficient for Mr. Armstrong to purchase the same type of coverage for himself and his family that he had prior to SWPT's unilateral decision to terminate the benefit. Armstrong affidavit, ¶14. Mr. Armstrong continued to ask SWPT to honor its contractual agreement to provide full health insurance coverage for himself and his family. And, Mr. Christensen continued to assure him that SWPT was working on getting such coverage for its employees. *Id.*

By the winter of 1999, it became apparent to Mr. Armstrong that SWPT either would not, or could not cure Mr. Armstrong's complaints about lack of benefits. He, therefore, approached Messrs. Willmore and Christensen about the possibility of purchasing the Raton portion of the business. They expressed interest in such a deal. *Id.*, ¶16. At about the same time, Mr. Armstrong was told that Mr. Brett Plant was also expressing an interest in purchasing SWPT. Mr. Armstrong arranged a meeting with Mr. Plant. During their meeting, Mr. Armstrong told Mr. Plant that he had been having several problems with his contract with SWPT, and they specifically discussed the lack of both a 401K plan and the lack of health care insurance. *Id.*, ¶17. Mr. Plant subsequently purchased SWPT.

In July 2000, Mr. Armstrong was called to Miner's and Colfax Medical Center by the then acting CEO of the hospital. *Id.*, ¶18. The acting CEO told Mr. Armstrong that SWPT employees

4

would not be permitted to practice at the hospital, because SWPT had not provided proof of current professional liability insurance coverage. Under the terms of the contract, SWPT was to have provided Mr. Armstrong with professional liability insurance paid in full. No SWPT employees were able to provide services at the hospital for the next three days, when SWPT finally provided proof of coverage. *Id.*; *see also*, Baca affidavit, ¶10. As a result of this suspension, there was a 3-day loss of gross accounts receivable from the hospital, resulting in a reduction of Mr. Armstrong's compensation.

In August 2000, after Mr. Brett Plant and Mrs. Kellie Plant had become owners of SWPT, they held a meeting with the employees in Raton, including Mr. Armstrong. At that meeting, they specifically told the employees that they were aware that there had been problems with the employment agreements and general employee dissatisfaction with the former owners. Armstrong affidavit, ¶19 and Baca affidavit, ¶11.

The next week, the Plants met individually with Mr. Armstrong in Raton, to discuss his contract. At that meeting, Mr. Armstrong told them that he felt that his contract was not being honored. *Id.*, ¶20. The Plants then told him that this was the case for most of SWPT's professional employees, and they asked Mr. Armstrong to give them some time to try and resolve the contract issues. Mr. Plant also told Mr. Armstrong that setting up a retirement plan should be pretty easy, and that since he owned an insurance agency, he could get some help in getting a group health insurance policy. *Id.*; *see also*, Baca affidavit, ¶12 (Mr. and Mrs. Plant met individually with Baca to discuss his contract. He told them that the contract was not being honored. Mr. Plant asked Baca what was the most important benefit that need to be reinstated first, and he responded health insurance. Mr. and Mrs. Plant asked Baca to give them some time

5

to resolve the contract issues).

On November 10, 2000, Mr. Armstrong received a fax from SWPT attaching the rates for a group health insurance policy. *See* Exhibit C to Armstrong affidavit, and affidavit, ¶21. In the fax, SWPT states that it will pay up to $175.00 per month toward health insurance for employees only. Upon receiving the fax, Mr. Armstrong called Mr. Plant and told him that he did not think that the coverage being offered was in accordance with the contract, which provided that he was entitled to full medical insurance for himself and his family. Armstrong affidavit, ¶22. Mr. Plant then told Mr. Armstrong that he was "different" and that he should complete the enrollment form and send it in. Mr. Plant assured Mr. Armstrong that they would take care of him. *Id.* Based on these assurances, Mr. Armstrong completed the form and sent it to SWPT.

On November 20, 2000, Mr. Armstrong received a memo from Mrs. Kellie Plant. *See* Exhibit D to Armstrong affidavit, and affidavit ¶23. In her memo, Mrs. Plant tells Armstrong that he has "elected to enroll in Blue Cross Blue Preffered (sic) Plan C as a family at a cost of $516.56 a month. Southwestern Physical Therapy will pay a maximum amount of $330.00 a month (regardless of future rate increases)." *Id.*; *see also*, Baca affidavit, ¶13 (Baca received a similar memo informing him that he had elected to enroll in the Blue Cross plan at a cost to him of $0 per month. SWPT would only pay a maximum of $175 a month for this coverage regardless of any future rate increases).

In response to the November 20th memo, Mr. Armstrong provided a memo to Mrs. Plant telling her that the coverage set forth in her November 20th memo was not in accordance with his contract. Armstrong affidavit, ¶24. Shortly thereafter, Mr. Armstrong received a phone call from Mr. Plant telling him that he wanted to have meeting. Mr. Armstrong then met with Mr. Plant in

Raton during the first week in December. *Id.*, ¶25. At that meeting, Mr. Plant was upset that Mr. Armstrong had questioned the fact that SWPT was not going to fully pay for health insurance for himself and his family. Mr. Plant told Mr. Armstrong that as a "highly paid employee" he should be responsible for his own insurance coverage. *Id.* Mr. Armstrong then asked Mr. Plant about the life insurance and 401K plan required by his contract, and was told that SWPT was unable to do anything at the time, and probably would not. Mr. Armstrong reminded Mr. Plant that he had assured him in August that SWPT would honor his contract, and was told that as a highly paid employee he was basically just out of luck. Mr. Plant then told Mr. Armstrong that SWPT was looking at restructuring his contract and wanted to do so in the next couple of weeks. *Id.*

On December 11, 2000, Mr. Armstrong sent Mr. Plant a memo, telling him that he had been thinking about his contract and that he was willing to meet with Mr. Plant soon to discuss it. Mr. Armstrong's memo proposed that the contract be left as written, but that perhaps they could modify it to provide another 1% raise in compensation to cover either insurance or as salary. *Id.*, ¶27. Mr. Armstrong did not receive a response to this memo.

On January 18, 2001, due to SWPT's continuing breach of his contract, and their apparent unwillingness to cure the breaches, Mr. Armstrong resigned from his employment with SWPT. *See* Exhibit E to Armstrong affidavit.

## ARGUMENT

**I.    SWPT materially breached the contract and, therefore, may not enforce the <u>non-compete provision</u>.**

It is well settled that a material breach by one party to a contract will relieve the other party from further performance under the contract. *See, e.g., Resolution Trust Corp. v. Federal*

7

*Savings and Loan Ins. Co.*, 25 F.3d 1493 (10th Cir. 1994) ("A material failure of performance constitutes a breach that discharges the injured party from performance."); *cf., Gilmore v. Duderstadt*, 125 N.M. 330, 336, 961 P.2d 175, 181 (Ct. App. 1998) (it is a "firmly rooted principle of contract law that, in the case of a bilateral contract for an exchange of performances, one party's repudiation of its duty to perform discharges the other party's remaining duties of performance under the contract").

This rule -- that a material breach by one party will relieve the other party of performance under the contract -- has been specifically applied in the context of employee covenant not to compete cases. In *Alexander & Alexander, Inc. v. Feldman*, 913 F.Supp. 1495 (D. Kan. 1996), for example, an insurance brokerage company sought a preliminary injunction to prevent a former employee from breaching a non-compete agreement. The district court denied the employer's motion for summary judgment. In reaching its conclusion, the court first noted that in order for the employer to recover upon the contract, it

> first must demonstrate its own performance . . . . Plaintiff cannot recover for defendant's violation of the non-compete provisions of the employment contract if plaintiff was the first to breach the contract.

913 F. Supp. at 1501.

The court in *Alexander & Alexander* then found that the plaintiff-employer had materially breached the employment contract by unilaterally modifying the defendant's compensation in 1992, 1993, and 1994. *Id.* Significantly, the court rejected the defendant's claim that plaintiff had waived any breach by accepting the benefits of the employment contract for four years after the first unilateral modification. *Id.*, at 1502. The court found that there was no waiver because "the

evidence demonstrates that defendant continually objected to the unilateral changes in his compensation package." *Id. See also, Francorp, Inc. v. Mark Siebert*, 126 F.Supp.2d 543 (N.D. Ill. 2000) (employer's failure to pay employees in a timely manner was a material breach precluding enforcement of covenants not to compete); *Galesburg Clinic Association v. West*, 706 N.E.2d 1035 (Ill. App. 1999) (former medical partners could not be held to non-compete provisions where members of the partnership's executive committee had breached the partnership agreement by holding secret meetings in which they took unauthorized votes); *Ward v. American Mutual Liability Ins. Co.*, 443 N.E.2d 1342 (Mass. Ct. App. 1983) (where employer wrongfully discharged salesmen by firing them on a date other than on their anniversary dates, as required by the employment agreement, employer could not enforce non-compete covenants. "It is well established that a material breach by one party excuses the other party from further performance under the contract"); *cf., Electrical Distributors, Inc. v. SFR, Inc.*, 166 F.3d 1074 (10th Cir. 1999) (employee's breach of covenant not to compete relieved other party of obligation to make payments to employee on a promissory note); and *Danzer v. Professional Insurors, Inc.*, 101 N.M. 178, 679 P.2d 1276 (1984) (where employer breached the contract by discharging employee without good cause, then under the terms of the contract, employee was no longer bound by non-compete provision).

Defendant submits that in this case, the evidence establishes that SWPT continually breached its contract with Mr. Armstrong by: 1) failing to pay him based on *all* Raton accounts; 2) unilaterally terminating the 401K plan; 3) unilaterally terminating health and life insurance coverage; and 4) failing to ensure that the hospital had proof of Mr. Armstrong's professional liability insurance so as to avoid being suspended from practicing at the hospital for 3 days in July

2000.

## II.     Plaintiff has not established that the contract was modified.

In New Mexico, "[a] written contract may be modified by a subsequent oral agreement, even though the written contract requires that modification be in writing." *Powers v. Miller*, 127 N.M. 496, 498, 984 P.2d 177, 179 (Ct. App. 1999). Such modifications, however, must be established by clear and convincing evidence. *Id.*, at 499, 984 P.2d at 180.

The Court of Appeals in *Powers* noted that other courts have advanced different reasons for requiring that oral modifications to a written contract be established by clear and convincing evidence. Some courts have required a heightened standard of proof because a claim of "modification" is deemed to be similar to claims of fraud, accident or mistake. Other courts "have attributed the heightened standard to the doctrine of waiver of a known right and have held that because such waivers must be proven by clear and convincing evidence, the same burden of proof should apply to oral modifications to a written contract." *Id.* The Court of Appeals held that

> While all of these considerations are important, we believe that the higher standard of proof is appropriate in order to avoid the type of ambiguous situation that occurred in this case, in which one party thought the contract had been modified and the other did not think a modification had occurred. We further believe that requiring proof by clear and convincing evidence is an appropriate balancing of the principles of freedom of contract against the sanctity of written contracts.

*Id.*

In this case, SWPT has failed to provide clear and convincing evidence that the written contract between themselves and Armstrong was modified by mutual consent. Their only argument is that the Court should infer such modifications based on the fact that Mr. Armstrong did not quit right away. Based on Mr. Armstrong's affidavit, and the exhibits attached thereto

10

however, it is clear that Mr. Armstrong did not consent to any modifications to his written contract. *See* Armstrong affidavit, filed separately herein, ¶13 and 15 (at no time did Mr. Armstrong ever agree to modify the contract requirement that SWPT provide a 401K plan, nor did Mr. Armstrong ever agree to modify the contract so as to release SWPT from the requirement to provide full medical insurance for both him and his family); *accord* Baca affidavit, ¶¶7 and 9.

### III.   Defendant did not waive Plaintiff's material breaches of the contract.

Plaintiff argues that even if they are in breach of their contract with Mr. Armstrong, he has waived any right to claim a breach. Plaintiff's argument is not supported by the evidence, and is without merit. As with Plaintiff's claim of "modification" the claim of "waiver" must be established by clear and convincing evidence, not by inference.

> Waiver involves the intentional relinquishment of a known right. 'However, a party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future. . . .' waivers of rights in contract will not be inferred unless the intent to waive is clear.

*AM Cosmetics, Inc. v. Solomon*, 67 F.Supp.2d 312, 318 (S.D.N.Y. 1999).

In *Ed Black's Chevrolet Center, Inc. v. Melichar*, 81 N.M. 602, 604, 471 P.2d 172, 174 (1970) the New Mexico Supreme Court held that

> In no case will a waiver be presumed or implied, contrary to the intention of the party whose rights would be injuriously affected thereby, unless, by his conduct, the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to.

In this case, there is no evidence that Plaintiff could have had an "honest belief" that Mr. Armstrong ever intended or consented to waive his rights to the benefits and compensation set

11

forth in his contract. Indeed Mr. Armstrong's affidavit, and the memos attached thereto establish the exact opposite; as does SWPT's belated efforts in December 2000 to partially cure their prior breach of failing to provide *full* medical insurance by offering some coverage to its employees.

In *Francorp, Inc. v. Siebert, supra,* two of the defendants remained on the job even though they had not been paid by the employer for 14 weeks. 126 F.Supp.2d at 546. The court found that these defendants had not waived there right to claim a breach of contract on the part of the employer. The court noted that while it was true that the defendants had tolerated late paychecks for a time and had exhibited an understanding of their employer's financial situation, they had never agreed to work for free. *Id.*, at 547.

Similarly, in *Alexander & Alexander, supra,* the Court found that the defendant had not waived his right to claim a breach of the employment agreement even though he had continued to work for the employer for four years after the employer had first unilaterally changed his compensation formula. "The evidence demonstrates that defendant continually objected to the unilateral changes in his compensation package instituted by plaintiff and Jardine." 913 F.Supp. at 1502.

In *Galesburg Clinic, supra,* the Court held that the defendants had not waived breaches of the partnership agreement even though they continued to work in the partnership for over a year after the breach occurred. 706 N.E.2d at 1037. The court found that the defendants had continued to work while protesting the unlawful actions of the executive committee, and held that

> [t]heir delay in exiting the partnership was reasonable considering the complexity of the partnership, the nature of the practice of medicine, and the professional and personal ramifications of their exit. The defendants' delay in resigning cannot be considered a clear and unequivocal waiver of the right to declare a breach.

12

*Id.*, at 1037 - 8.

Like the defendant in *Alexander & Alexander*, the evidence in this case establishes that Mr. Armstrong continually objected to SWPT's attempts to unilaterally change the terms of his contract. And, like the defendants in *Galeburg Clinic*, his reluctance to resign was reasonable when one considers the nature of the practice of physical therapy in a small community like Raton.

### IV.     Plaintiff cannot establish that it is entitled to an injunction.

"'Injunctions are harsh and drastic remedies which should issue only in extreme cases of pressing necessity and only where there is no adequate and complete remedy at law.'" *Hill v. Community of Damien of Molokai*, 121 N.M. 353, 369, 911 P.2d 861, 877 (1996) (quoting *Padilla v. Lawrence*, 101 N.M. 556, 562, 685 P.2d 964, 970 (Ct.App.), *cert. denied*, 101 N.M. 419, 683 P.2d 1341 (1984)).

As noted in the Memorandum in Support of Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction ("Plaintiff's Brief"), in order for the Plaintiff in this case to be entitled to an injunction, it must prove each of four separate factors: 1) there is a substantial likelihood that it will prevail on the merits; 2) it will suffer irreparable harm unless the injunction issues; 3) the injunction would not be contrary to the public interest; and 4) the threatened injury to plaintiff outweighs any harm the proposed injunction may cause the opposing party. Plaintiff's Brief, p. 4.

In this instance, Plaintiff has failed to prove at least three of these four factors. First, in light of its own prior material breaches of the contract, Plaintiff is unable to show that there is a substantial likelihood that it will prevail on the merits in this case. Indeed, Defendant submits that just the opposite is true.

Second, Plaintiff cannot establish that it would suffer irreparable harm if an injunction is not issued. Plaintiff acknowledges that its contract with the hospital was terminated by the hospital. Complaint, ¶20. Plaintiff alleges that this was as a result of Defendant's actions, which allegations, Defendant emphatically denies. Be that as it may, Plaintiff has not introduced any evidence which would establish that the hospital has had a sufficient change of heart such that it is likely to award a new contract to Plaintiff. Moreover, in the event that Rocky Mountain Physical Therapy receives the hospital contract, Plaintiff may be fully compensated by money damages based on payments under the contract.

Third, Plaintiff cannot show that the injunction is not be contrary to the public interest. In fact, an injunction will be directly contrary to the public interest, because it may well result in the inability of the residents of Colfax County, New Mexico to receive rehabilitation therapy and treatment through the hospital. If Plaintiff is deemed an unacceptable bidder by the hospital, a not unlikely result given their recent termination, and if the only other bidder, Rocky Mountain Physical Therapy, is enjoined along with Mr. Armstrong from providing such services, then a new request for proposal will have to published. In the meantime, Plaintiff's contract ends on April 8, 2001, and the only other licensed physical therapist in Raton, aside from Mr. Armstrong, is Mr. Brandon Baca, a former employee of SWPT, whom SWPT would in all likelihood also seek to enjoin should he try to work for the hospital. In light of these circumstances, defendant submits that an injunction in this case would be directly contrary to the public interest.

## CONCLUSION

For all of the foregoing reasons, Defendant Eric Armstrong, respectfully requests that the Court deny Plaintiff's application for a temporary restraining order and motion for a preliminary

14

injunction, together with such other and further relief as the Court deems just and proper.

                Respectfully submitted,

                MODRALL, SPERLING, ROEHL, HARRIS
                  & SISK, P.A.

By: *Angelo J. Artuso* (signature)
     Douglas R. Vadnais
     Angelo J. Artuso
     Attorneys for Defendant Eric Armstrong
     Post Office Box 2168
     Albuquerque, New Mexico 87103-2168
     Telephone: (505) 848-1800

WE HEREBY CERTIFY that a true
and correct copy of the foregoing pleading
was faxed to all counsel of record this
_____12th_____ day of March, 2001.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: *Angelo J. Artuso* (signature)
    Angelo J. Artuso

0159294

15